## BIRMINGHAM ICE & COLD STORAGE CO. v. DAVIS.

### No. 9375.

Circuit Court of Appeals, Fifth Circuit.

May 24, 1940.

Rehearing Denied July 8, 1940.

454

Lee C. Bradley, Jr., of Birmingham, Ala., for appellant.

Lee A. Jackson and Sewall Key, Sp. Assts. to Atty. Gen., Samuel O. Clark, Jr., Asst. Atty. Gen., and Jim C. Smith, U.S. Atty., of Birmingham, Ala., for appellee.

Before SIBLEY, HUTCHESON, and McCORD, Circuit Judges.

HUTCHESON, Circuit Judge.

The suit was for refund of income taxes, overpaid. The claim was that the Commissioner had charged to plaintiff as income earned and received by it the proceeds of sales of ice, which in law and in fact had been earned and received by Rushton Corporation by virtue of an arrangement between the plaintiff and Rushton for the joint or combined operation of both plants with appropriate allocations of sales to each. The defense was (1) that the sales were in fact made by and the earnings were in fact earnings of, the taxpayer, and the arrangement relied on had not as made, and particularly as carried out, been effective to change this fact; and (2) that the Commissioner, under Section 45 of the Revenue Act of 1928, 26 U.S.C. A.Int.Rev.Acts, page 364,[1] had, pursuant to his determination, that apportionment of gross income was necessary in order to clearly reflect the income of plaintiff and Rushton, and prevent evasion of taxes, distributed, apportioned, and allocated it accordingly.

The District Judge upon findings in effect that the operation of the business of the two companies in 1931, was not substantially different from what it had been in prior years, and that plaintiff's allocation of income to Rushton had been made, not pursuant to any binding contract or any obligation on plaintiff's part to do so, but entirely of its own volition, determined that plaintiff not Rushton, had made the sales in question and that the income derived therefrom, was therefore, plaintiff's, not Rushton's, and he gave judgment accordingly.

Appellant is here insisting, that these findings and the judgment thereon are contradicted by the undisputed facts of record, that the companies agreed upon and put into effect, the plan by which the earnings were allocated. This is the testimony upon which it mainly relies. The minutes of the director's meetings and the resolutions of both companies adopted the same day.[2]

---

[1] "Sec. 45. Allocation of Income and Deductions

"In any case of two or more trades or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Commissioner is authorized to distribute, apportion, or allocate gross income or deductions between or among such trades or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such trades or businesses."

[2] Minutes of a Special Meeting of Directors of Birmingham Ice & Cold Storage Company.

The President of the Company called the directors' attention to the decrease in tonnage production by the company which he felt was largely due to economic conditions. This decrease in tonnage production necessarily resulted in a heavy increase in cost per ton of production.

Inasmuch as the Birmingham Ice & Cold Storage Company's manufacturing capacity is 54% of the total manufacturing capacity of the Birmingham Ice & Cold Storage Company and The Rushton Corporation and, consequently, The Rushton Corporation's manufacturing capacity is 46% of this total; therefore, it was deemed wise to authorize the managements of these respective companies to operate only such plant or plants as should prove necessary to furnish the amount of ice that the combined companies were able to market. Such a plan would give the plant or plants operating a full capacity run and, consequently,

The testimony of W. J. Rushton; that ice is a seasonal business and though there is not enough all the year around business for both plants, it was necessary to keep Rushton available as standby service to supplement the capacity of plaintiff's plant during the hot summer months; that for many years the two plants had been operated more or less jointly; that sales of the combined plants, through City Ice Company, had decreased in 1929, 1930 and 1931, and it was more economical to run the Rushton plant as auxiliary to plaintiff's plant; that the plan outlined in the director's meeting had been discussed with the stockholders and its advantages were thoroughly explained and all were agreeable to and satisfied with it. The testimony of Woodrow, Chairman of the Board of the two companies but without interest in either, that he determined the allocation as between the plaintiff and the Rushton Corporation of the payments to each for ice delivered to City Ice Company on the basis of the difference between City Ice Company's cost of doing business and what it received from the sales less what it might have to retain to keep its equipment going, and that this method of operation was more economical than if both plaintiff and Rushton had run as competing concerns. The testimony of Allen Rushton, plaintiff's executive vice-president, that starting back in 1925 and continuing through 1930, the percentage of ice sales made by the Rushton Corporation plants out of the total sales made by the City Ice Delivery Company, progressively decreased. Plaintiff's plants were more centrally located, and particularly plaintiff's plants had to be run of necessity to furnish refrigeration for the cold storage buildings, and as necessity for economy arose, it was in his judgment, best to use the Birmingham Ice plants whenever possible, they being more centrally located and slightly more modern and convenient, and to hold Rushton for peak seasons. He had been in the practice of probably discriminating against Rushton, knowing that the all over economy would be greater to the Birmingham Ice. Over the years, beginning in 1925, this process

would greatly reduce the production cost per ton, thereby saving each company an appreciable amount of expense.

"Be It Resolved that the President of the Birmingham Ice & Cold Storage Company be and is hereby authorized to make whatever arrangements with The Rushton Corporation seem necessary in order to carry out this plan, and furthermore, that said plan be continued year after year, so long as it seems profitable to both companies to pursue said plan."

Minutes of Special Meeting of Directors of the Rushton Corporation.

The President of the company called the directors' attention to the unusual decrease in tonnage production by the company, which he felt was largely due to the economic situation. This decrease had necessarily resulted in a heavy increase in the manufactured cost per ton. The President further stated that these same conditions were being experienced by the Birmingham Ice & Cold Storage Company and that inasmuch as the ownerships of these two companies were practically identical, he suggested that some arrangement be made with the Birmingham Ice & Cold Storage Company whereby both companies would be enabled to operate only such plants as seemed necessary to supply the market, with as little unnecessary expense as possible and he presented the following plan for consideration:

Inasmuch as The Rushton Corporation's manufacturing capacity is 46% of the total manufacturing capacities of the combined Birmingham Ice & Cold Storage Company and The Rushton Corporation; therefore, it seemed wise to authorize the managements of these respective companies to operate only such plant or plants as should prove necessary to supply the available market with ice. Such a plan would give to the plant or plants operating, nearly full capacity runs and consequently, would greatly reduce the cost per ton to both companies, thereby saving each an appreciable amount of expense.

Under this plan, The Rushton Corporation could purchase ice from the Birmingham Ice & Cold Storage Company at a price approximating the latter company's manufactured cost. Furthermore, the latter company, by reason of being able to operate its plants at or near full capacity, would have a much lower per ton cost of production and consequently, would be in position to furnish The Rushton Corporation with ice at a price substantially less than that at which The Rushton Corporation could produce the same quantity of ice.

The President stated that unless some such arrangement as this were made, it appeared probable that neither company, so long as the present economic situation prevailed, would be able to earn sufficient revenue to take care of their respective operating costs, taxes, insurance, etc.

of looking at the operations as joint or combined rather than as the operation of separate companies, had had the effect of constantly and progressively discriminating against Rushton, and that had not been compensated for in any way prior to 1931. "In 1931 we proposed a plan to protect Rushton from that discrimination. Then I felt that I was free and at liberty to discriminate against it still further, believing that the plan would take care of the discrimination at the end of the year. On account of the adoption of this plan, I operated the plants of the Rushton Corporation somewhat less during the year 1931 than in previous years. I held them off even later in the year. Previously I started them up in order to give them some run, not cut them out entirely but this year I held them off until toward the end of the season. The adoption of this plan operated to the prejudice and detriment of Rushton. It was prevented from producing ice which I believe could have been sold for more than the cost of production. The plan was intended to compensate for that to some extent."

On this testimony and testimony of other witnesses to the same effect, appellant insists that here was a joint venture entered into upon adequate reasons and consideration and upon definite terms and carried out in accordance with those terms. Appellee on the other hand insists that here was no joint venture, no fixed and definite plan for joint operation. There was simply an understanding that the operations for 1931 and years following should go on in the future as in the past, with plaintiff furnishing the greater part of the ice and Rushton filling in the gaps in the peak season, with this difference only, that at the end of the year, there would be allocated to Rushton, such part of the earnings as seemed right. It insists therefore, that plaintiff's case failed for want of evidence that there was any definite and fixed agreement for the sale of any definite or fixed amount of ice to Rushton, or for a joint operation on any fixed or definite basis, and that the allocation of $26,000 of the moneys derived from plaintiff's sales was neither in accordance with the plan proposed at the director's meeting for sales to Rushton, nor with any other definite plan having the

effect of making the amount allocated to Rushton, the income or earnings of Rushton. Its further position is that if the evidence leaves in any doubt that the whole sum allocated to Rushton was earned by appellant, the Commissioner's allocation of income and deductions under Section 45, Revenue Act of 1928, was well within the authority conferred by the act and may not be disturbed. We agree with respondent. As Thompson found himself in Thompson v. United States, 5 Cir., 110 F.2d 585, plaintiff, under the undisputed facts, finds itself under a burden too heavy to be borne when it undertakes to sustain the allocation to Rushton of part of the moneys received from sales of ice by it, either as moneys earned by Rushton or as a proper business expense that plaintiff was entitled to take as a deduction.

As shown by the testimony of Allen Rushton, executive vice-president of plaintiff company, the case is simply this, that of the moneys earned by plaintiff as the result of a plan of operation of companies having the same officers and directors and owned by the same interests, in a manner thought the most economical, by shutting Rushton down except in the peak season, it was decided that in justice to Rushton, the Chairman of the Board of both companies should, at the end of the year, allocate to Rushton, some of plaintiff's earnings.

None of the stockholders of the two companies are complaining, no doubt none could complain, but as between appellant and the government, appellant may not earn the income and then at the year's end, by apportioning a part of it to Rushton, escape the payment of taxes thereon. Further, if under the evidence, there is any question as to whether plaintiff earned the whole of the $26,000 in question, there can be none that the case falls directly within Section 45, authorizing the Commissioner to make distribution, apportionment or allocation, to prevent evasion of taxes, or clearly to reflect the income of the ice business conducted by the two companies. Nor can there be any, that upon the facts of record, the Commissioner's allocation to appellant as its income of the income it actually earned, is reasonable and valid.

The judgment was right. It is affirmed. Affirmed.